UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

The Netherlands Insurance Company, a
New Hampshire corporation,

          Plaintiff,

v.

Main Street Ingredients, LLC, a Wisconsin
limited liability company, and Malt-O-
Meal Company, a Minnesota corporation,

          Defendants.

Main Street Ingredients, LLC,

          Counter-Claimant,

v.

The Netherlands Insurance Company,

          Counterclaim Defendant.

Court File No.  11-cv-00533-DSD-FLN

**MAIN STREET INGREDIENTS'
MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

## INTRODUCTION

Netherlands Insurance Company ("Netherlands") has refused to indemnify Main

Street Ingredients, LLC ("MSI") for its $1.4 million settlement of claims asserted by

Malt-O-Meal Company ("MOM") in a Hennepin County District Court action.  In this

motion, MSI seeks a declaration that the settled claims fall within the scope of

Netherland's two applicable insurance policies and are not otherwise excluded.  In other

words, they are covered.  MSI seeks this determination early because, while a few other

4919531v1

issues remain for later resolution, a decision on these key matters is likely to advance settlement.

MOM's suit sought damages for its losses due to the incorporation of non-fat dried instant milk into MOM's oatmeal products. MSI had bought the instant milk from a third party and then resold it to MOM. MSI's supplier recalled the instant milk because there was a reasonable probability that the use of the instant milk would cause serious adverse health consequences or death. Also, the FDA deemed the instant milk adulterated. MOM followed with a recall of its own oatmeal.

MOM claimed that MSI was liable because the instant milk was adulterated due to: a) contamination with salmonella; and b) production under insanitary conditions that might lead to contamination. Netherlands denies coverage for MOM's claims on the grounds that: a) MSI cannot satisfy its policies' insuring agreements; and b) three exclusions apply. Netherlands' key argument as to the insuring agreements is that the suit did not involve "property damage" (defined by the policies to include "physical injury") because the instant milk was not actually contaminated with salmonella. The trial court, however, found sufficient evidence of contamination to warrant a trial on the issue.[1] Furthermore, even assuming for the sake of argument that there was no actual salmonella contamination, MOM's claim was also that the instant milk was adulterated because it was produced under insanitary conditions. Numerous courts have found that

---

[1] As explained below, the Court need not determine whether the instant milk was actually contaminated. Rather, for purposes of this motion, all the Court need determine is whether the settled claims were within the scope of the insuring agreement and not otherwise excluded.

blending an adulterated product into another product constitutes "physical injury" to the other product. This is true regardless of the nature of the adulteration. For this and other reasons, the definition of "property damage" has been satisfied.

### UNDISPUTED FACTS

**A.    The 2009 Recall of MOM's Instant Oatmeal Product**

MSI is a Wisconsin limited liability company that distributes various food products. (Declaration of Bill Schmitz (hereafter "Schmitz Dec."), ¶ 2). In 2007, MSI purchased certain nonfat dried milk ("Instant Milk") from Plainview Milk Products Cooperative ("Plainview"), and resold it to MOM. (*Id.*, ¶ 3). MSI did not repackage, or otherwise alter, the Instant Milk prior to resale to MOM. (*Id.*, ¶ 3). MOM blended the Instant Milk with eight other ingredients to create its instant oatmeal products ("Instant Oatmeal"). (Ex. I to Declaration of Michael H. Streater (hereafter "Streater Dec."), p. 2; Schmitz Dec., ¶ 8).

The Instant Milk that MSI sold to MOM came from Plainview Lots Numbers 298 and 397. (Schmitz Dec., ¶ 3). The first, Lot 298, was shipped to MOM in August, 2007. (*Id.*) The second, Lot 397, was shipped in December, 2007. (*Id.*) MOM produced its Instant Oatmeal from the two lots of Instant Milk between January 2, 2008 and June 4, 2009. (Ex. I to Streater Dec., p. 13).

In the summer of 2009, during an inspection by the Federal Food and Drug Administration ("FDA"), salmonella was detected in Plainview's manufacturing facility. (Ex. E to Streater Dec.). FDA also cited Plainview for numerous insanitary conditions which were observed at the facility. (*Id.*) Following the results of the FDA inspection,

and in response to urging by FDA, in late June, 2009, Plainview initiated a voluntary recall of certain products, including Instant Milk manufactured between June 4, 2007 and December 31, 2007, and identified as Lot Numbers 255-455. (Ex. A to Schmitz Dec.; Ex. D to Streater Dec., pp. 116-117.) Specifically, on June 23, 2009, Plainview issued a recall notice, informing its customers that certain products had the potential to be contaminated with salmonella and that it was recalling the following:

> [A]ll agglomerated ("Instant") products including Instant Non-Fat Dry Milk, . . . because they have the potential to be contaminated with Salmonella, an organism which can cause serious and sometimes fatal infections in young children, frail or elderly people, and others with weakened immune systems. . . .

(Ex. A to Schmitz Dec.; Ex. D to Streater Dec., pp. 128-129). The recall notice further recommended that Plainview's customers "includ[e] a copy of this recall letter to all downstream consignees who may have received these recalled products." (Ex. A to Schmitz Dec.) Plainview further advised that if any company receiving the Instant Milk had used it as an ingredient in a "new product", they would be required to initiate their own recall:

> If you or your customers have used our products as an ingredient of another food (including pet food), FDA considers this a "NEW" products for which the manufacturer will be responsible to recall. Anyone who has used our products as an ingredient should contact their local FDA district office to discuss the need to recall. If you believe the processing of your product eliminated the Salmonella risk, be prepared to provide the district office with the necessary scientific data to assess the adequacy of the processing.

(*Id.*)

As directed in the recall notice, MSI forwarded Plainview's recall notice to MOM, its "downstream consignee," on June 26, 2009. (Schmitz Dec., ¶ 7, and Ex. B thereto).

Because the two lots of Instant Milk which were used by MOM as an ingredient in its Instant Oatmeal were subject to Plainview's voluntary recall, MOM thereafter recalled its Instant Oatmeal packets, and destroyed them. (Ex. I to Streater Dec., pp. 2, 12).

In August, 2009, FDA classified Plainview's recall as a Class I recall (Ex. D to Streater Dec., pp. 116-117), which "means that the recall involves a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death." 21 C.F.R. § 7.3(m)(1).

**B.    MOM Pursues its Losses**

MOM initiated the Underlying Lawsuit against MSI and Plainview on October 7, 2009, seeking to recover damages sustained as a result of MOM's recall of its Instant Oatmeal.[2]  (Ex. A to Streater Dec., pp. 8-11).  MOM later elaborated, alleging that MSI was in breach of its contract with MOM by distributing a product which was:   a) processed under insanitary conditions, and b) actually contaminated with salmonella, thereby rendering the product "adulterated" under FDA regulations.  (Ex. J to Streater Dec., pp. 18-23).[3]

---

[2] Horizon, L.L.C., a named plaintiff in the Underlying Lawsuit, was merged into MOM in 2007. (Ex. A to Streater Dec., ¶ 6).

[3] Under federal law, a "food shall be deemed to be adulterated" if, among other things, it:

> (1) [ ] bears or contains any poisonous or deleterious substance which may render it injurious to health . . . (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health[.]

MOM alleged that it had sustained damages in excess of $2.8 million. (Ex. H to Streater Dec.). MOM also sought its attorneys' fees (Ex. A to Streater Dec., p. 12) and, pursuant to Minn. Stat. § 549.09, would be entitled to prejudgment interest on its damages in the amount of ten percent per annum. In all, MSI's potential liability in the Underlying Lawsuit was in excess of $3.5 million.[4]

## C.    The Policies And Netherlands' Refusal To Indemnify

Netherlands issued MSI commercial general liability policies with policy numbers CBP8295067, covering the periods July 1, 2007 through July 1, 2008 (the "2007-2008 Policy") and July 1, 2008 through July 1, 2009 (the "2008-2009 Policy") (collectively referred to herein as the "Policies"). (Ex. D to Schmitz Dec.). Netherlands also issued Policy CBP8683215, covering the period July 1, 2009 through July 1, 2010 (the "2009-2010 Policy") *Id.* Each Policy provides "property damage" coverage in the amount of $1,000,000 per occurrence, with an aggregate limit of liability of $2,000,000. (*Id.*) The Policies further provide supplemental coverage for "[p]rejudgment interest awarded against the insured on that part of the judgment we pay . . .." (*Id.* at NETH 000322.)

---

21 U.S.C. § 342(a). In correspondence with Plainview following the recall, FDA stated that the recalled non-fat dried milk was in fact adulterated.  (Ex. F to Streater Dec., p. 3).

[4] Plainview was sued by a number of its customers as a result of the recall. Because it had limited insurance coverage for these claims, Magistrate Judge Young B. Kim of the United States District Court for the Northern District of Illinois, the assigned Magistrate Judge in Case No. 09-CV-05429, scheduled a "global settlement conference" for all of the customer claims against Plainview. (Ex. B to Streater Dec., at Ex. A).  A settlement between Plainview and MOM was eventually reached under which MOM received $719,139.37, in return for which MSI and MOM agreed that all claims against Plainview would be dismissed. (Streater Dec., ¶ 3). Plainview was dismissed from the Underlying Lawsuit in May 2011. (Ex. C to Streater Dec.).

4919531v1

MSI gave notice of the Underlying Lawsuit to Netherlands. (Schmitz Dec., ¶ 4). Netherlands initially denied coverage and refused to provide MSI with a defense. But, Netherlands eventually agreed to defend MSI in the Underlying Lawsuit, subject to a reservation of rights to deny coverage. (Schmitz Dec., ¶ 5).

On March 2, 2011, Netherlands commenced this action seeking a declaration that it has no obligation to defend or indemnify MSI for any loss in the Underlying Lawsuit. (Doc. 1 at 12-14). On April 11, 2011 MSI filed its Answer and Counterclaim, seeking a declaration that Netherlands had an obligation to defend and indemnify it in the Underlying Lawsuit. (Doc. 9 at 9.)

**D.    Judge Dickstein's May 14, 2012 Order**

MSI and MOM filed cross-motions for summary judgment in the Underlying Lawsuit. (Ex. G to Streater Dec.). MSI moved for summary judgment on the grounds that MOM had no evidence either that the Instant Milk was actually contaminated with salmonella or that the Instant Milk had been packed under insanitary conditions, and as a result, MOM's claims for strict liability, breach of contract and breach of express and implied warranty all failed as a matter of law. (*Id.*, pp. 8-9). MOM moved for partial summary judgment on the grounds that the Instant Milk was adulterated under FDA regulations, and thus MSI was in breach of its contractual obligation to supply product compliant with FDA regulations. (*Id.*, p. 11).

The summary judgment motions were heard by the Honorable Mel I. Dickstein, Hennepin County District Court, on April 16, 2012. MOM's motion for summary judgment was denied; MSI's motion as to MOM's claim for strict liability was granted,

4919531v1

but denied as to MOM's claims for breach of contract and breach of warranty. (*Id.*, p. 1). In denying MSI's motion, Judge Dickstein concluded that questions of fact existed as to whether the Instant Milk was: (1) actually contaminated with salmonella; or (2) manufactured under insanitary conditions. (*Id.*, pp. 10-11). If either of the foregoing were true, Judge Dickstein held, the Instant Milk was "adulterated" under FDA regulation, and MSI was liable. (*Id.*) In short, if at trial it was found that the Instant Milk was "adulterated" under FDA regulations, it would be liable to MOM in an amount potentially in excess of $2.8 million, exclusive of attorney's fees, interest and fees.

**E.**    **MSI And MOM Settle The Underlying Lawsuit**

On June 19, 2012, MSI and MOM participated in a mediation to resolve the Underlying Lawsuit. (Streater Dec., ¶ 13). Netherlands and its counsel were present at the mediation. (*Id.*) In order to avoid a possible $3.5 million judgment, MSI settled the Underlying Lawsuit for a payment of $1.4 million to MOM, with all of the settlement funds coming from MSI.  (*Id.*) Netherlands did not object to the fact or amount of settlement. (*Id.*)

A final settlement agreement in the Underlying Lawsuit was executed on June 28, 2012, and MSI paid MOM $1.4 million on July 13, 2012. (Schmitz Dec., ¶ 9, and Ex. C thereto).

Following its settlement with MOM, MSI amended its counterclaim in this action to assert a claim against Netherlands for breach of contract, seeking judgment against Netherlands for the $1.4 million settlement payment to MOM.  (Doc. 32). By this motion, MSI seeks partial summary judgment as to Count I in its Amended Counterclaim,

namely, for a declaration that MOM's two remaining claims were within the scope of the Policies' Insuring Agreements and not otherwise excluded from coverage.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and …the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  A fact is material only when its resolution affects the outcome of the case. *Nelson v. Wachovia Sec. LLC*, 646 F. Supp. 2d 1066, 1071 (D. Minn. 2009) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* Moreover, a party opposing a motion for summary judgment cannot rely upon general statements of fact, but rather must come forward with specific evidence and facts which create a genuine issue for trial. *Mitsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 586 (1986) (non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts").

This motion implicates no genuine issue of material fact, but rather turns on the interpretation of the Policies and undisputed facts. Under their terms, the 2007-2008 and 2008-2009 Policies provide coverage for the Underlying Lawsuit, and MSI's motion should be granted.

4919531v1

**ARGUMENT**

## I.    <u>SUMMARY</u>

Given Judge Dickstein's Order in the Underlying Lawsuit, the liability MSI faced when it settled with MOM was liability for both types of adulteration, *i.e.*, because the Instant Milk was actually contaminated with salmonella, and because it was produced under insanitary conditions, rendering it adulterated under FDA regulations. Thus, the only issue for this Court on this motion is whether the Policies provide coverage for either type of adulteration. As explained below, MSI's liability for adulteration, whether due to actual or potential contamination, is the type of liability covered under the Policies' Insuring Agreement, and is not excluded from coverage by any exclusion. *See, Jackson Nat'l Life Ins. Co. v. Workman Secs. Corp.*, 803 F. Supp. 2d 1006, 1012 (D. Minn. 2011) ("[t]he party seeking indemnification need only show that it **could have** been liable under the facts shown at trial not whether they **would have** been.") (bold emphasis in original).

## II.    <u>THE INSURING AGREEMENT HAS BEEN SATISFIED</u>

Netherlands' first argument, that the Insuring Agreement[5] has not been satisfied, is based on three contentions:

---

       **1.**    **Insuring Agreement**

          a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies . . . .

. . .

          b.    This insurance applies to "bodily injury" and "property damage" only if:

(1)     the absence of <u>actual</u> salmonella contamination in the Instant Milk and Instant Oatmeal precludes a finding of "property damage" to the Instant Oatmeal;

(2)     because there was no <u>actual</u> salmonella contamination, there was no "occurrence" under the Policies; and

(3)     because MSI knew of the adulteration of its Instant Milk prior to July 1, 2009, the Policies' "known loss" provision precludes coverage under the 2009-2010 Policy.

(Ex. K to Streater Dec., pp 6-11).

As explained below, each of these arguments fails.

### A.     The Damages Incurred In The Underlying Lawsuit Resulted From "Property Damage" To The Instant Oatmeal Product

Netherland's first contention is that there was no "property damage" as required by the Insuring Agreement because the Instant Milk was not actually contaminated. (Ex. K to Streater Dec., p. 6). Netherland's argument appears to concede that MOM's first claim, *i.e.*, that the Instant Milk was adulterated because it was actually contaminated with salmonella, involved a claim for "property damage" within the meaning of the

---

(1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)     The "bodily injury" or "property damage" occurs during the policy period; and

(3)     Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who is an Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part . . . .

(Ex. D to Schmitz Dec., at NETH 000315).

Policies.[6] But regardless, MOM's assertion that the Instant Milk was "adulterated," whether due to actual contamination, and due to production under insanitary conditions, involved claims for the "property damage" within the Policies' definition of that term.

The key to the analysis is the Policies' "property damage" definition:

"Property damage" means:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it: or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Ex. D to Schmitz Dec., at NETH 000330).

As many courts have found, the incorporation of an adulterated ingredient, regardless of the type of adulteration, causes "property damage" to the product into which it was incorporated, under either prong of the Policies' "property damage" definition.

### 1. The Instant Oatmeal Product was "physically injured" by the incorporation of the adulterated Instant Milk

The first prong of the "property damage" definition requires "physical injury" to tangible property. Courts around the country have followed two lines of thought as to

---

[6] Netherland disputes whether the Instant Milk was in fact contaminated. But so long as MSI was potentially liable for the settled claims, which was clearly the case given Judge Dickstein's summary judgment decision, the question for the Court is whether those claims were covered, not whether actual contamination existed. *HK Sys. Inc. v. Easton Corp.*, No. 02-C-1103, 2007 WL 1747016, at 9 (E.D.Wis. June 18, 2007), *aff'd* 553 F.3d 1086 (7th Cir. 2009) (citing *Deminsky v. Arlington Plastics Mach.*, 259 Wis. 2d 587, 619 (2003)); *Burlinton N. Inc. v. Hughes Bros.*, 671 F.2d 279, 283 (8th Cir. 1982)("When liability under an indemnity contract has been denied by the indemnitor, proof of actual legal liability to the injured party is not a requirement.").

what constitutes "physical injury" for this purpose. Some hold that the incorporation of a potentially contaminated product, resulting in loss, is enough.  The leading case is Judge Posner's decision in *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 810 (7th Cir. 1992), *cert denied* 507 U.S. 1005 (1993). *See also Johnson v. Studyvin*, 828 F. Supp. 877, 883 (D. Kan. 1993); *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 823 F. Supp. 975, 983 (D. Mass. 1993); *Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc.*, 778 A.2d 1132, 1137 (N.J. 2001). Others interpret the phrase "physical injury" more narrowly, requiring some form of actual change resulting from the incorporation of a contaminated or defective product, so that the "property [be] altered in appearance, shape, color or in other material dimension." *See e.g.*, *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 496 (Ill. 2001).

The Wisconsin Supreme Court has yet to definitively rule on this issue.[7]  But this Court need not speculate as to how that court would rule.  Under either line of cases, the incorporation of an adulterated ingredient results in "physical injury" to the product into which it is incorporated. Thus, the use of adulterated Instant Milk as an ingredient caused "physical injury" to MOM's Instant Oatmeal.

        a.    The broader line of cases finds that physical incorporation itself constitutes "Physical Injury"

The Seventh Circuit, in *Eljer Manufacturing*, held that the incorporation of a potentially defective product, even without physical damage in the ordinary sense of the term, is enough to constitute "physical injury" to the product into which it was

---

[7] For purposes of this Motion, MSI assumes Wisconsin law applies as that is the state in which MSI, the insured, resides, and the State in which the Policies were issued.

incorporated. 972 F.2d at 810. The *Eljer* court looked not to the physical alteration of the property, but rather to the "loss that results from physical contact, physical linkage, as when a potentially dangerous product is incorporated into another and, because it is incorporated and not merely contained . . . must be removed, at some cost, in order to prevent the danger from materializing." *Id.* In other words, it is the "physical" contact or commingling that causes "injury."

In reaching its interpretation of "physical injury," the *Eljer* court looked to the intent of the drafters of the comprehensive general liability language at issue. *Id.* Notably, the court held:

> The 1966 version of the General Comprehensive Liability Insurance policy form had defined "property damage" as "injury to or destruction of tangible property." Most courts, in apparent harmony with the drafters' intentions . . . gave the term "injury" in the new definition a broad interpretation . . . Some, however, excluded injuries in which there was no physical contact between the injurer and the property injured by him.

*Id.* In light of the confusion, and to further articulate the scope of the term "property damage," the definition was redefined to the two-part definition included in the Policies. (*Id.*) Namely, that "property damage" includes (1) "physical injury to tangible property" – *i.e.* injury to property stemming from physical contact with the insured's potentially contaminated or defective product; and (2) "loss of use of tangible property that is not physically injured" – *i.e.* "injury which is not 'physical' because there is no physical touching of the tort victim's property."[8] *Id.*

---

[8] The *Eljer* court uses as an example the restaurateur who is injured by a defective crane which falls in front of, but does not touch, his restaurant, thereby blocking access to it. *Id.*

The *Eljer* court's rule comports with the reasonable expectations of the insured. *Id.* at 809 ("these nice, physicalist, 'realistic' (in the philosophical sense) distinctions [between physical damage – *i.e.* physical alteration – and the "ticking time bomb"] have little to do with the objectives of parties to insurance contracts."). [9]

Under this interpretation of the term "physical injury," incorporation of the Instant Milk into the Instant Oatmeal caused "physical injury" to the Instant Oatmeal. Between January 2, 2008 and June 4, 2009, MOM blended the adulterated Instant Milk with other ingredients to create the Instant Oatmeal product. (Ex. I. to Streater Dec., p. 2; Schmitz Dec., ¶ 8). Once these ingredients were co-mingled, they could not be separated. (*Id.*) The Instant Milk could not be removed, requiring MOM to initiate a recall, and, ultimately, to destroy the affected product. The "physical" incorporation of the adulterated, and potentially contaminated, Instant Milk in MOM's product, resulted in loss, and caused "injury," to MOM's product.

---

[9] Indeed, the Policies' Impaired Property exclusion, exclusion m, shows Netherlands intended that the "incorporation" of a potentially contaminated ingredient would constitute "physical injury." The exclusion applies to "'property damage' to 'impaired property' or property that has not been physically injured." (Ex. D. to Schmitz Dec. at NETH 000320). The Policies' use of the term "or" in the exclusion means that "impaired property" and "property not physically injured" are not the same thing. *See Hull v. State Farm Mut. Auto. Ins. Co.,* 222 Wis.2d 627, 638, 586 N.W.2d 867 (1998) ("The meaning of 'or' is plain: 'or' is a connector of alternative choices in a series."). "Impaired property" must, therefore, be property that has been "physically injured." And, "impaired property," in relevant part, is defined as "'tangible property, other than 'your product' or 'your work' that cannot be used or is less useful because . . . (a) It incorporates 'your product' or 'your work', that is known or thought to be defective, deficient, inadequate or dangerous." Hence, incorporation of an adulterated product must constitute "physical injury."

      b.    Even under the narrower reading of "Physical Injury" the incorporation of the adulterated Instant Milk resulted in the physical alteration of the Instant Oatmeal product

Moreover, even if this Court applies the narrower line of cases, MOM's claims still involved "physical injury" within the meaning of the Policies. Courts interpreting this phrase narrowly have required that a finished product be "altered in appearance, shape, color or <u>in other material dimension</u>" before physical injury will be found. *See e.g.*, *Travelers Ins. Co.*, 757 N.E.2d at 496. (Emphasis added.) Incorporation of an adulterated ingredient alters the product into which it is incorporated "in other material dimension" where it renders that product useless and unsalable. *See e.g. Nat'l Union Fire Ins. Co. v. Terra Indus., Inc.*, 216 F. Supp. 2d 899, 905 (N.D. Iowa 2002), *aff'd*., 346 F.3d 1160 (8th Cir. 2003). Hence, under even this narrower interpretation, the incorporation of the adulterated Instant Milk caused "physical injury," and therefore "property damage," to MOM's Instant Oatmeal product.

In *Terra Industries*, the insured, Terra, manufactured fertilizer. *Id.* at 901. Carbon dioxide was a by-product of its fertilizer products. Terra sold this carbon dioxide for use in carbonated beverages. *Id.* at 902. In 1998, Terra detected benzene, a known carcinogen, in a sample of its carbon dioxide by-product, and informed the manufacturers and sellers of carbonated beverages who had incorporated its carbon dioxide product. *Id.* at 903. Although the amount of benzene detected posed no risk to human life or health, many of the beverage manufacturers and sellers decided to issue a recall of their products. *Id.* Terra was subsequently sued, and found liable, because the inclusion of benzene in the carbonated beverages at issue rendered those products "unsalable." *Id.* at

905. As the judge in the underlying litigation found, "[t]he affected products themselves were in a real sense unsaleable in the sense that no consumer would knowingly buy them and manufacturers could not as responsible manufacturers be seen to attempt to sell them." *Id.*

Terra sought coverage from National Union for the claims asserted against it by the beverage manufacturers. National Union denied coverage, taking the position that the incorporation of the non-harmful benzene-laced carbon dioxide did not cause "physical injury" to the final beverage products. *Id.* at 911. The court disagreed. *Id.* at 917. Critical to the court's determination was the fact that once the benzene-laced carbon dioxide was incorporated into the beverages, those beverages became unsalable and "useless for [their] intended purpose, human consumption." *Id.* Notably, the court reasoned that, while the incorporation of a contaminated or defective ingredient may not alter the food or beverage into which it is incorporated in "appearance, shape, color," or in some other respect visible to the naked eye, it certainly alters that product in "other material dimension" – namely, the incorporation of a contaminated or defective ingredient renders the product useless. *Id.*

Especially in the world of food manufacturers and distributors, the *Terra* court's reasoning makes sense. If some form of <u>visible</u> alteration to tangible property were required before "physical injury" could be found, it is hard to imagine a situation in which a general liability policy would provide coverage. While it may not be visible to the naked eye, the use of a contaminated or otherwise adulterated ingredient has a disastrous effect on the product into which it is incorporated. It renders that product

unsalable, unusable, and, ultimately, results in its destruction.  As a California court of appeals succinctly stated, a court should have "no difficulty in finding property damage where a potentially injurious material in a product causes loss to other products into which it is incorporated." *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg, Inc.*, 78 Cal. App. 4th 847, 865 (2000) (finding that the incorporation of nut clusters which were potentially contaminated with wood splinters caused "physical injury" to the cereal into which they were incorporated). Courts around the country agree. *See e.g.*, *Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc.*, No. 5:00-CV-149-OC-10GRJ, 2002 WL 1433728, at *3 (M.D. Fl. Feb. 11, 2002) (the incorporation of adulterated juice as an ingredient resulted in physical injury to final juice product); *Travelers Indem. Co. v. Dammann & Co.*, No. 04-5699, 2008 WL 370914, at *6 (D.N.J. Feb. 11, 2008) (incorporation of insured's contaminated vanilla beans into third-party's vanilla extract resulted in damage to tangible property).

Like the beverage manufacturer in *Terra Industries*, upon learning that it had incorporated an adulterated ingredient into its Instant Oatmeal product, MOM, as a "responsible manufacturer," could not attempt to sell this product. This is even more true given the fact that, as reflected in Plainview's recall notice to its consumers, the FDA was urging a recall of MOM's affected product.[10] (Ex. A to Schmitz Dec.; Ex. D to Streater

---

[10] Indeed, unlike *Terra Industries*, where the benzene-laced carbon dioxide was determined to pose no risk to human health, FDA classified Plainview's recall as a Class I recall, meaning that there was a "reasonable probability that the use of, or exposure to, the [Instant Milk] will cause serious adverse health consequences or death." (Ex. D to Streater Dec., pp. 116-117).

4919531v1

Dec., pp. 116-117). Like the beverages at issue in *Terra Industries*, once the adulterated Instant Milk became irremovably incorporated into the Instant Oatmeal product, that product became "useless for [its] intended purpose, human consumption." The Instant Oatmeal product was rendered unsalable, unusable, and, ultimately, was destroyed.

Moreover, the *Terra* court's decision did not turn on a determination of "loss of use." Rather, the court determined that because the incorporation of benzene-laced carbon dioxide had an immediate "effect" upon the carbonated beverages, those beverages were "physically injured." Namely, the incorporation of the adulterated ingredient rendered the carbonated beverages unsalable, and, in essence, by the incorporation of an adulterated ingredient, the carbonated beverages had been destroyed.[11] *Id.* at 916-18. The type of adulteration is irrelevant to the question of "physical injury" –  what matters is the "effect" the incorporation of an adulterated ingredient has on the product into which it is incorporated. Here, as in *Terra*, the introduction of an adulterated ingredient resulted in the destruction of the Instant Oatmeal.

Indeed, in the context of recalled food or beverage, cases hold that the use of an adulterated ingredient, regardless of the type of adulteration, and regardless of whether

---

[11] The *Terra* court distinguished cases where the contaminated product was only temporarily unusable, and could be restored to use by the expenditure of funds, and the removal and replacement of the defective component. *Id.* at 914-16. In contrast to those cases, the court held that once the contaminated carbon dioxide was incorporated into the beverages, it could not be removed. *Id.* at 917. At the moment of incorporation, the beverages were rendered forever useless. *Id.* The same is true here. Once the Instant Milk was incorporated into the Instant Oatmeal, it could not be removed, and the Instant Oatmeal was rendered forever unsalable and unusable.

the adulterated ingredient renders a product injurious to human health, causes "physical injury" to the finished product. As the United States District Court for the Middle District of Florida wisely recognized:

> [T]he accidental introduction of an adulterant is a physical event that causes injury or damage just as surely as the damage resulting from the collision of two automobiles. Further, the fact that the adulteration does not make the resulting blend totally unfit for human consumption (so that the blended juice may still be marketed under different labeling) does not alter the conclusion that damage has occurred.

*Cutrale Citrus Juices USA, Inc.*, 2002 WL 1433728, at *3; *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (the incorporation of an unapproved pesticide, even though the product could still be safely consumed, constitutes physical damage to property); *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 806 N.Y.S.2d 709 (N.Y. App. Div. 2005) (incorporation of faulty raw ingredients resulting in "off-tasting" soft drinks constituted physical damage); *see also Terra Indus., Inc.*, 216 F. Supp. at 903. This makes sense because regardless of the type of incorporation, federal law prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated or misbranded." 21 U.S.C. § 331(a). Thus the adulteration of a food product, in any form, renders that product "useless for its intended purpose, human consumption." *See Terra Indus.*, 216 F. Supp. at 917.

## 2. The incorporation of a defective or potentially defective ingredient resulted in the loss of use of the Instant Oatmeal product

Even if this Court disagrees with the courts cited above, and finds that the incorporation of the adulterated Instant Milk did not cause "physical injury" to MOM's Instant Oatmeal product, the Instant Oatmeal product still suffered "property damage."

4919531v1

In addition to "physical injury to tangible property", the Policies define property damage to include the "[l]oss of use of tangible property that is not physically injured." Here, there can be no dispute that MOM lost the use of its Instant Oatmeal Product by the incorporation of adulterated Instant Milk.

Even assuming no "physical injury" is found, when one product is incorporated into another, and renders the finished product useless, there has undoubtedly been a "loss of use of tangible property that is not physically injured." *See Precision Cable Assemblies LLC v. Central Resistor Corp.*, 635 N.W.2d 905, 2001 WI. App. 254, at ¶¶ 3-4 (Wis. Ct. App. 2001), *review denied*, 638 N.W.2d 591 (2002) (the incorporation of a defective product rendering the product into which it was incorporated useless constitutes physical injury to tangible property, or, at the least, loss of use of property that is not physically injured); *see also Riceland Foods, Inc. v. Liberty Mut. Ins. Co.*, No. 4:10CV00091 SWW, 2011 WL 2262932, at *7 (E.D. Ark. June 8, 2011) ("the negligent or accidental contamination of the commercial rice supply by unapproved, unmarketable [genetically modified] rice . . . and the resulting harm to the grower plaintiffs' fields and rice crops, whether viewed as physical injury to tangible property or lost use of tangible property, constitutes 'property damage' under the Policies.").

MOM, as the result of the incorporation of adulterated Instant Milk into its Instant Oatmeal, recalled and destroyed the product. And, because the Instant Milk was blended with other products to create the Instant Oatmeal, it could not be removed. Thus, MOM's Instant Oatmeal was indisputably rendered useless, and MOM incurred "property damage" for which MSI ultimately became liable.

4919531v1

21

**B.** **The Property Damage To MOM's Instant Oatmeal Was Caused By An Occurrence**

Netherlands' second argument as to why the requirements of the insuring clause have not been met is that because the Instant Milk was not actually contaminated, no "occurrence" took place. (Ex. K to Streater Dec ., pp. 9-10). "Occurrence" is defined by the Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Ex. D. to Schmitz Dec. at NETH 000329). Wisconsin courts interpreting similar language have interpreted "occurrence" to mean "[a]n unexpected, undesirable event or an unforeseen incident which is characterized by lack of intention." *Doyle v. Engelke*, 219 Wis. 2d 277, 289, 580 N.W.2d 245, 250 (1998) (internal quotation or citation omitted) (interpreting the meaning of the term "event" which was defined exactly as "occurrence" is in the Policies, from the standpoint of the insured.); *see also Patrick v. Head of the Lakes Coop. Elec. Ass'n*, 295 N.W.2d 205, 207 (Wis. Ct. App. 1980) (an "occurrence" includes even "an intended act and an intended result if they cause damage unintended from the standpoint of the insured.")

In the context of food adulteration cases, courts view the incorporation of the contaminated product into the insured's product as the potential "occurrence." *See e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1165 (8th Cir. 2003), *cert. denied*, 541 U.S. 939 (2004) ("the incorporation of contaminated carbon dioxide into consumer beverages constituted an 'occurrence' resulting in 'property damage' within the meaning of the policy." Emphasis added); *Chubb Ins. Co. v. Hartford Fire Ins.*, No. 97 CIV. 6935 LAP, 1999 WL 760206 (S.D.N.Y. Sept. 27, 1999), *judgment*

*aff'd*, 229 F.3d 1135 (2d Cir. 2000) (the <u>incorporation</u> of adulterated juice concentrate into final juice product constitutes an "occurrence").

Accordingly, so long as MSI did not intend harm to MOM by providing adulterated Instant Milk to MOM, MOM's incorporation of the product into its Instant Oatmeal constituted an "occurrence." *See Chubb Ins. Co.*, 1999 WL 760206 at *8. MSI, of course, did not and could not know the Instant Milk was adulterated until it received Plainview's recall notice on June 23, 2009. (Schmitz Dec., ¶ 6). MOM, however, blended the Instant Milk into its Oatmeal product between January 2, 2008 and June 4, 2009. As such, MSI could not possibly have intended any harm to MOM under these circumstances.

**C.    MSI Was Unaware Of The Property Damage Prior To The 2007-2008 And 2008-2009 Policy Periods**

Netherlands' final argument is that MSI has not satisfied the Insuring Agreement's "known loss" provision.[12]  (Ex. K to Streater Dec., pp 10-11). Specifically, Netherlands argues that because MSI was allegedly aware of its property damage prior to the 2009-2010 Policy period, which incepted on July 1, 2009, there can be no coverage. (*Id.*, p. 10). The 2007-2008 and 2008-2009 Policies, however, provide coverage, not the 2009-2010 Policy.

---

[12] The "known loss provision" provides that:

> Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who is an Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part . . . .

(Ex. D to Schmitz Dec. at NETH 000315).

The Policies state that coverage is provided where the "'property damage' occurs during the policy period." And, property damage to MOM's Instant Oatmeal occurred at the moment of the incorporation of the adulterated Instant Milk into the Instant Oatmeal, which was immediately rendered unmarketable and useless for its intended purpose. *See Plastics Eng'g Co.*, 759 N.W.2d at 621 (damages occur at the time of exposure). Here, the Instant Milk was blended into MOM's Instant Oatmeal product between January 2, 2008 and June 4, 2009. (Ex. I to Streater Dec., p. 13). Thus, the "property damage" to MOM's Instant Oatmeal product "occur[ed]" during the 2007-2008 and 2008-2009 Policy periods. Those Policies, not the 2009-2010 Policy, provide coverage for the liability incurred by MSI in the Underlying Lawsuit.[13]

The earliest date upon which MSI, or anyone, could have known of the existence of "property damage" to MOM's Instant Oatmeal was June 23, 2009, the date Plainview's recall notice was issued – after the later of the two Policies incepted on July 1, 2008. (Schmitz Dec, ¶ 6). Indeed, the FDA inspection which resulted in the recall did not even occur until June of 2009. (Ex. E to Streater Dec.).

Because MSI could not have known of the property damage to the Instant Oatmeal product prior to the 2007-2008 or 2008-2009 Policy periods, the "known loss" provision does not relieve Netherlands of its obligation to indemnify.

---

[13] Even if this Court finds property damage resulting from the "loss of use of tangible property that is not physically injured", that loss is "deemed to occur at the time of the 'occurrence' that caused it." (Ex. D. to Schmitz Dec. at NETH 000330). And as discussed above, the "occurrence" in this case was the incorporation of the adulterated Instant Milk into the Instant Oatmeal.

### III.    COVERAGE IS NOT PRECLUDED BY ANY POLICY EXCLUSIONS

In addition to asserting that the insuring agreement does not provide MSI with an initial grant of coverage for the Underlying Lawsuit, Netherlands argues that three exclusions operate to preclude coverage.    The three are:  1) exclusion k, "Damage to Your Product"; 2) exclusion m – "Impaired Property"; and 3) exclusion n – "Recall of Products, Work or Impaired Property." None of these exclusions applies in this case.

### A.    The Policies' "Damage to Your Product" Does Not Apply

Netherlands first argues that exclusion k, the **"Damage To Your Product"** exclusion precludes coverage. (Ex. K to Streater Dec., pp. 11-13). This exclusion, however, only precludes coverage for "'Property Damage' to 'your product' arising out of it or any part of it.'" (Ex. D. to Schmitz Dec. at NETH 000319). "Your product" is defined in relevant part as "[a]ny goods or products . . . distributed . . . by . . . You." (*Id.* at NETH 000330-331). So, although the Instant Milk may fall within the Policies' definition of "your product",  the Instant Oatmeal clearly does not. Further, the liability incurred by MSI in the Underlying Lawsuit stems from "property damage" to the Instant Oatmeal -- *i.e.* MOM's product -- not to the Instant Milk. Thus, this exclusion does not apply.

### B.    The Policies' "Impaired Property" Exclusion Does Not Apply

Netherlands next seeks to exclude coverage based on the "Impaired Property" exclusion, exclusion m. (Ex. K to Streater Dec., pp. 13-15). This exclusion precludes coverage for:

4919531v1

25

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(Ex. D. to Schmitz Dec. at NETH 000320). This exclusion, however, requires that MOM's Instant Oatmeal constitute either "impaired property" or "property not physically injured." As discussed below, it plainly does not.

### 1.  MOM's Instant Oatmeal product does not constitute "impaired property" as that term is defined under the Policies

Netherlands first argues that the exclusion applies because Instant Oatmeal constitutes "impaired property."  (Ex. K to Streater Dec., p. 14). The Policies define "impaired property", in relevant part, as:

"Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

  a.   It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

* * *

If such property can be restored to use by:

  a.   The repair, replacement, adjustment or removal of "your product" or "your work" . . .

(Ex. D. to Schmitz Dec. at NETH 000328). In advancing its argument, Netherlands relies on the fact that the Instant Oatmeal was made with the adulterated Instant Milk. (Ex. K to

Streater Dec., p. 14). But, Netherlands ignores the fact that a critical component of the definition of "impaired property" is that it must be possible to restore the property to use by removal of the insured's product. Here, the Instant Milk was blended with a number of other ingredients to create the Instant Oatmeal product. (Schmitz Dec., ¶ 8). Once the ingredients had been combined, they could not be separated. (*Id*.) The Instant Oatmeal product simply could not be restored to use by removal of the insured's Instant Milk product. Accordingly, the Instant Oatmeal product does not constitute "impaired property," and the Impaired Property Exclusion does not apply. *See Security Nat'l Ins. Co. v. Glorybee Foods, Inc.*, No. Civ. 09-1388-HO, 2011 WL 902635 (D. Or. Mar. 15, 2011) (incorporation of contaminated peanuts in a way which prevented removal precluded application of impaired property exclusion); *Amerisure Mut. Ins. Co. v. Hall Steel Co.*, No. 286677, 2009 WL 4724303, at *4 (Mich. Ct. App. Dec. 10, 2009) (defective wiper blades that could not be restored to use by removal of defective steel did not qualify as impaired property).

**2.    MOM's Instant Oatmeal product was physically injured, and the remainder of the Impaired Property Exclusion does not apply**

Netherlands also argues that the "Impaired Property" exclusion applies because the Instant Oatmeal was not "physically injured."  As articulated *supra* Section II.A.1, however, the incorporation of the adulterated Instant Milk caused "physical injury" to the Instant Oatmeal. As a result, the exclusion does not apply.

Furthermore, like the first prong, the second prong of the exclusion is meant to apply only to exclude economic loss resulting from the insured's product. In short, this

exclusion is a "business-risk exclusion" which excludes only "economic loss caused by [the insured's work or product], which is a business risk commonly absorbed as a business expense." *See Newark Ins. Co. v. Acupac Pkg., Inc.*, 746 A.2d 47, 53 (N.J. Super. Ct. App. Div. 2000). It is meant to exclude coverage only for damages that are associated with repairing or replacing the insured's product. *Id.* (the purpose of the exclusion is to "negate coverage or claims against a[n] [insured] for breach of contract and faulty workmanship <u>where the damages claimed were solely the cost of correcting the work [or product] itself</u>." *Id.* at 53 (emphasis added)). *Shade Foods, Inc.*, 93 Cal. Rptr. 2d at 377 (quoting *Seagate Tech. v. St. Paul Fire & Marine, Ins. Co.*, 11 F. Supp. 2d 1150, 1155 (N.D. Cal. 1998) (Its actual intent is to reflect the principle that "the risk of replacing or repairing a defective product is considered a commercial risk which is not passed onto a liability insurer."). *See also Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis. 2d 16, 34, 673 N.W.2d 65, 74 (2004), *reconsideration denied*, 679 N.W.2d 548 (2004) (business risk exclusions are drafted "with an eye toward preventing policyholders from . . . converting their liability insurance into protection from nonfortuitous losses such as claims based on poor business operations.").[14]  Because MOM's claim was for

---

[14] Indeed, any other interpretation of the exclusion would render nugatory coverage for "loss of use of tangible property that was not physically injured." An insured could not become "legally obligated" to pay damages for "loss of use" of a product unless it arose from a defect, inadequacy, or deficiency in the insureds product. And, where an exclusion in an insurance policy "totally swallows the insuring provision, the provisions are completely contradictory. That is the grossest form of ambiguity . . .." *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 525, 687 A.2d 1375, 1380 (1997); *See also Laabs v. Chicago Title Ins. Co.*, 72 Wis. 2d 503, 511, 241 N.W.2d 434, 438-39 (1976) ("'A construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions

the consequential damages it suffered, not the price of the Instant Milk or the cost to

replace it, the exclusion does not apply.

### C.     The Policies' Recall Exclusion Does Not Apply

In a final effort to avoid coverage, Netherlands argues that coverage is excluded

by exclusion n. (Ex. K to Streater Dec., p. 15). This precludes coverage for:

> Damages claimed for any loss, cost or expense incurred by you or others
> for the loss of use, withdrawal, recall, inspection, repair, replacement,
> adjustment, removal or disposal of:
>
> **(1)** "Your product";
>
> **(2)** "Your work"; or
>
> **(3)** "Impaired property";
>
> If such product, work, or property is withdrawn or recalled from the market
> or from use by any person or organization because of a known or suspected
> defect, deficiency, inadequacy or dangerous condition in it.

(Ex. D. to Schmitz Dec. at NETH 000319). Netherlands is wrong.

This exclusion precludes coverage for any "loss, cost or expense incurred" as a

result of the recall of "your product" or "impaired property". The liability incurred by

MSI in the Underlying Lawsuit was incurred as a result of the recall of MOM's Instant

Oatmeal. And, as discussed above, MOM's Instant Oatmeal constitutes neither "your

product" nor "impaired property". Thus, this exclusion does not apply.

---

and is consistent with the general intent.'"). And "'ambiguous terms in an insurance
contract will be construed in favor of the insured.'" *Summers v. Touchpoint Health Plan,
Inc.*, 309 Wis. 2d 78, 98, 749 N.W.2d 182, 192 (2008) (quoting *Pitcher v. Principal Mut.
Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996)). This exclusion should be construed narrowly
and in favor of MSI to limit its scope to the cost of the product or its replacement.

Courts addressing the application of recall – *i.e.* "sistership" – exclusions have held that they apply <u>only</u> to recalls initiated by the insured. *See United States Fire Ins. Co. v. Good Humor Corp.*, 496 N.W.2d 730, 737-38 (Wis. Ct. App. 1993), *review denied*, 501 N.W.2d 458 (Wis. 1993) ("sistership" exclusion "should apply only to recalls initiated by the insured." This is true even though the recalled product was manufactured by the insured). Specifically, the majority of courts have held that the exclusion "applies only if the product or property which it is a part is 'withdrawn from the market or from use by the insured, and even in such situations, the policy still covers damages caused by the product that failed." *Bigelow-Liptak Corp. v. Continental Ins. Co.*, 417 F. Supp. 1276, 1282 (E.D. Mich. 1976) (sistership exclusion did not exclude claim for damages to third-parties product caused by insureds defective work.). *See also Elco Indus., Inc. v. Liberty Mut. Ins. Co.*, 414 N.E.2d 41, (Ct. App. Ill. 1980) (citations omitted). This makes sense. If this exclusion precluded recovery for all damage to a third-party's product it "would [ ] exclude what, as a practical matter, would usually be some of the largest foreseeable elements of . . . damage[s] . . . [and], in the absence of claims for damages resulting from consumer injury, would render the coverage nearly illusory." *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 314 N.E.2d 37, 39 (N.Y. 1974).

MSI did not initiate a recall of MOM's Instant Oatmeal – MOM did. In fact, MSI did not even initiate the recall of the Instant Milk – Plainview did. (Schmitz Dec., ¶ 6). MSI merely passed along the recall notice, as directed by Plainview, to its "downstream consignees," including MOM. (*Id.*, ¶ 7). But, even if it did, under the interpretation of the

sistership exclusion adopted by most courts, damages to a third-party's product caused by the incorporation of MSI's adulterated product are not excluded.

## CONCLUSION

Because the Policies provide coverage for the loss incurred by MSI in the Underlying Lawsuit, and because no exclusions apply, MSI's Motion should be granted.

Dated:  August 24, 2012                    **BRIGGS AND MORGAN, P.A.**

 

By:  s/ Michael H. Streater
    Lauren E. Lonergan (#143443)
    Michael H. Streater (#106331)
    Maren F. Grier (#0390221)
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402-2157
(612) 977-8400

**Attorneys for Main Street Ingredients, LLC**